Thank you, Mr. Miller. May it please the Court, Counsel. My name is Darren Miller and I represent Joseph Thompson, the defendant appellant in this matter. After a jury trial, Mr. Thompson was convicted of voluntary manslaughter, which was a lesser-included offense of the charged second-degree murder. Today we're asking this Court to reverse that conviction, the reason being is that the government failed to prove an element of that offense, being that it did not disprove beyond a reasonable doubt that Mr. Thompson acted in self-defense. Alternatively, we would ask this Court to remand this matter for a new trial because a district court abused its discretion in denying the defendant's proposed jury instruction, which would have instructed the jury that Mr. Thompson had a right to prevent an imminent felony commission and to stand his ground. Again, Your Honors, Mr. Thompson — I'm sorry — was required to prove that Mr. Thompson did not act in self-defense and was required to do so beyond a reasonable doubt. That was an element of the offense and the government not only failed to disprove that, but the evidence tends to show that Mr. Thompson actually was acting in self-defense. If you look at the evidence, Mr. Thompson was at our main groom's house in her bedroom with, I believe it was an infant daughter, and they were sitting there doing what people do, just talking, and Marty, the victim in this case, approached from the outside, ripped the screen off the bedroom window, which apparently was affixed by screws, opened the bedroom window. We have read the briefs, you know. Yes. Yes. But I think it's important — If you move to the legal issues, it would be helpful. Yes. But I believe, Your Honor, it's important to know the facts and to get into the facts to explain why — I read your brief. I know your view of the facts. Yes. And so far, you haven't said anything that approaches inconsistency or additions. So, Counsel, your client faces a very high burden to overturn a jury verdict on sufficiency of the evidence. But I am somewhat troubled by this case, and I'd like to focus on what evidence the jury had before it from the time that Mr. Thompson encountered the intruder outside the bedroom window until the time of the stabbing. In other words, there's a lot of things that we know that went on in the bedroom, but we don't seem to know much about what went on outside. That's correct. But I think it's important to know what went on in the bedroom to — so this Court can understand what would be going on in a reasonable person's mind. But to get to what occurred outside, the only real evidence we have of that is from a teenage boy's viewing of the incident from a treehouse. He did not hear the entire incident. He did not see the entire incident. Did he see anything inconsistent with the verdict? How do you mean, Your Honor? Well, did the boy see the defendant being attacked by the victim? Because I understand that what he said he saw was the big guy wailing on the little guy. Right. Yeah. He said that he saw two men fighting. The big man was the one throwing punches, as he called them. And the big man in this case would be the defendant. Yes, that's correct. And then there were, I think, he said three to five punches, if I recall correctly, and that Marty then fell to the ground. The defendant walked away, did not continue attacking. And that when he walked away, that's when Charmaine came outside, and that's when Mr. Thompson said, he tried fighting me. Well, Ms. Grooms testified, didn't she? Yes. So my notes say she testified that when she saw the victim lying on the ground, the defendant was there and he said, well, he attacked me. So that's, the boy was not the only evidence of what happened outside. Right. Yes. That's probably more significant. Yes. And that's what I was discussing, that when Ms. Grooms came outside, that that's what Mr. Thompson said to her. And beyond that, what happened was Marty had not lost the will, basically. He was not deceased at that point. Charmaine came outside. Marty got up, and she believed he was going to come to her and attack her. And as Your Honors know, she'd been beaten by Marty in the past. He's abusive and came to the window yelling and screaming, I know who's in there with you. So she believed at that point that Marty was still a threat to her. She soon figured out that Marty had been seriously injured, and ultimately Marty died from his wounds. But what this evidence shows, Your Honor, again, it was the government's burden to disprove beyond a reasonable doubt that Mr. Thompson was acting in self-defense. And I haven't even mentioned yet that Marty was on a near lethal amount of methamphetamine at this time, which Dr. Snell testified, methamphetamine gives people the will to drive and extra, basically, extra courage and extra stamina. And so that's what Mr. Thompson was dealing with outside. And further, if you look at the wounds on Marty, they were consistent with a frontal attack by a right-handed person. There is no indication that the defendant somehow ambushed Marty or anything like that. What Mr. Thompson was dealing with was an irate person who happened to be armed with a gun, by the way, on a nearly lethal dose of amphetamine, essentially committing a felony, trying to break into a home and to fight the roommate. Was there any evidence that the gun was ever brandished? No, Your Honor. Is there evidence the gun was loaded? No, but the gun was in a small bag and pretty much the entire contents, the large gun, it was a very large gun in a small bag, ammunition, multiple rounds of ammunition, and he had a single bullet in his pocket, which I think the only reasonable conclusion to draw from having a single bullet in your pocket and bringing a gun is that you want to have the ability to quickly load it. Did Mr. Thompson testify? No, he did not. So there was no testimony that he threatened to kill me or anything like that? No, but again, Your Honor, it was the government's burden. The burden was on the other side.  So our view of the evidence is taking this in a whole, even in a light most favorable to the State with the reasonable inferences, the government just did not meet its burden here. Well, I think when we just, I assume there was a motion not for judgment as a matter of law before the case was submitted. Was there? I'm sorry, Your Honor, I'm not sure I understand. Was there a motion for judgment as a matter of law before the case was submitted to the jury, typically a rule, you know, 50, whatever it is? I believe so, Your Honor. But that was denied. And I don't read your brief as arguing that it was an error to submit the case to the jury. Correct. So you've still got that uphill burden that you have to establish a reasonable jury could not find on this, what I would agree is at least a close case evidence, but a jury could not find guilt. Yes, Your Honor. I understand it's a very high burden in the appellate court. I agree with that. Well, so, I mean, the emphasis on the government has to prove no self-defense is that would be highlighted if you were appealing submission of the case to the jury. But I think it's not so significant. It is significant, but it's not dramatically so in reviewing the verdict. Yes, Your Honor. Our position is that even if you look at, this Court's job is to look at the evidence in the light most favorable to the government. And even doing that, if anything, the evidence tends to show that you acted in self-defense. So our position is that given that, that no rational jury could have found it. If I was a juror, I'd wonder, well, how can it be self-defense when you had the affirmative to go outside to have an additional encounter? And I think the answer to that is he was dealing with an intruder. He was dealing with someone who he had known had beaten Charmaine in the past. The intruder was no longer intruding. He was. He was in the process of going into the window at the time, Your Honor. Is that clear? I think it is. Well, Charmaine testified that she believed that Marty was coming into the bedroom. He'd reached in. She believed he was coming in. And at that time, that's when Mr. Thompson went outside. So is his position also that he was defending Charmaine? Yes, that's part of it. It's not only defense of him and defense of others. As far as being Charmaine, there's a baby inside the residence, and there was a roommate. And what do the facts show about what happened when she comes outside? As I understand it, she talked to him. He says that she said that he attacked me, and then he fled. He didn't seek to protect her from what potentially could have still been a dangerous situation with an armed man. Well, Your Honor, I think there's, I'm running a little short on time, but I think there's a couple of ways that could be looked. One, what do you do if you're in that situation? One way to deal with it would be, I guess, to approach him at the window, right? Well, no, I'm talking about outside, after the stabbing. Charmaine goes to help the stabbing person. Yes. The defendant gives his explanation as to what happened, that he was attacked. And then he left.  He walked away, but at that time, Your Honor . . . But he not only left, he fled the scene. Is that correct? Yes. He walked away. Yes. So he's potentially leaving her with someone who's armed and still potentially dangerous. Well, I think at that point, the evidence was that, obviously, Marty had been stabbed multiple times, and he'd fallen down, and the threat at that point . . . Your Honor, as the case law, as I said in my brief, people have multiple reasons for leaving the scene. And that's what juries do, is figure those kinds of things out, which is where we are with what could a reasonable jury have concluded. Yes. I mean, I would agree, Your Honor, that the flight evidence is something the jury can consider, but as the case law says, that that's minimal probe to value when it comes to guilt. Not only the cases have said that in other states, some states have even excluded that from the jury instructions. So, yeah, that's something that can be considered, but our position is that's a very minimal value, walking away. Because, I mean, a reasonable person would be in shock at that point. He went from minding his own business in her bedroom to moments later, he just stabbed someone multiple times. People react different ways in those situations. Your Honors, I'm down to just a minute fifty, so I guess I'll save my time for rebuttal. Thank you. Morning. May it please the Court. My colleague, Mr. Miller. I'm Kevin Colliner from the U.S. Attorney's Office in South Dakota, and I'm here asking this Court to affirm the conviction in this case. Your Honors, your questions have gotten right to the heart of what the closing arguments were about in this case. I mean, the defense had one side of view of the evidence, and the prosecution had another. Judge Graz, I'd like to go to your question about what was the evidence from when Mr. Thompson encountered the victim outside. And it dovetails with Judge Smith's, your questions. There was this encounter witnessed by a boy in a tree house across the street. The evidence was that it was well lit. He witnessed, he thought it was about five times the big guy struck the little guy. He saw the little guy fall down. He was asked directly if the little guy struck the big guy, and he said no. And then Charmaine comes out of the house. There's this brief interaction. Mr. Thompson walks away, and I get that the defense argued a different point there, but I think the more salient point, and the one that a reasonable jury could believe, is that if he was defending himself or others, he did not know that the victim was about to die. He must have known he'd stabbed him, but he left this man there who approached Charmaine at that point. Charmaine didn't know that she was out of harm's way, and he walks up the hill and ultimately gets in a car and is given a ride to Pierre, South Dakota, many miles away from the Lower Brule Reservation. Now, I get that this is one of these cases where it's evolving circumstances, and it really just centers around this element of self-defense, but the facts that the prosecution talked about in its closing is that Mr. Thompson, he was inside the house when the victim began pounding on the door. He was not asked to protect anyone. He was not asked to get rid of this victim. He went through two locked doors to get outside. Again, the only witness was this boy who saw what he saw and testified about. Didn't see the little guy strike the big guy. You know, there is no evidence, by the way, that the defendant knew about this gun. In fact, the government put on all sorts of evidence. There's blood everywhere, but there was no blood on this gun. It only was discovered when it fell out after the clothes were cut off in the ambulance on the drive to the hospital, ultimately. No evidence that Mr. Thompson was aware that the victim was armed. I haven't read the transcript, but my sense from the briefs is there was no evidence that anyone else could have stabbed him. Right. So we're just talking about, is counsel focused on what was the intent? Right. Indisputed that this defendant killed this victim. Counsel, it probably doesn't or may not impact what a reasonable jury could find, but it did trouble me some that the government seemed to be arguing that this man had no right to go out and confront an intruder who was trying to break into a house through a window where there was a woman and baby inside, the woman who he knew had been abused by this man before. Yeah. And the government seems to be arguing that it was somehow evidence that he was not acting in self-defense simply because he went to defend this woman and this baby, and I'm troubled by that. Well, and I think the jury was, too, because they convicted on the lesser included, obviously finding that it was a heat of passion offense rather than some kind of malice of forethought. Of course, the government was arguing for a second-degree murder conviction, and that's not what the jury decided. So a fair view of the facts, Your Honor, that, you know, you have this man who is known to be violent and violent against a woman inside the house. There's children, some of whom are the victim's children, in the house. And it's late at night, and he comes apparently enraged. No question that those are the indisputed facts that led to this encounter. And, you know, the jury was properly instructed using this Court's model instructions on self-defense, and they wrestled with that. That was the primary question that was debated in the closings, and that's what the jury wrestled with, and that's the conclusion that they reached. And, of course, at this stage, the Court is asking whether that there was no reasonable juror who could have found that. And I think the facts are abundant without, you know, restating both sides' closings, that there was a path for a reasonable jury to find a conviction here. One final point I wanted to make was about the methamphetamine intoxication. There's also no evidence that the defendant knew of the intoxication of the victim. I just point that out because it was a point made by opposing counsel. Would you like to address the jury instruction issue briefly in terms of whether the jury instruction was actually given adequately and correctly covered the substance of what was requested? Yeah. So here again was a question that the district court wrestled with extensively. This wasn't a — the record on the settling of this jury instruction isn't one where it was, you know, a few sentences in a transcript. In fact, the district court heard argument from defense counsel on this South Dakota-based instruction, South Dakota state law-based instruction, even passed out the relevant copies of the cases to counsel so everyone could discuss the matter and reached a reasoned conclusion as to why the model instruction was the appropriate one. First and foremost, the district court said the instruction proffered by defense counsel didn't really match the facts because this wasn't really a stand your ground scenario. This is a scenario where the defendant approached the victim. It wasn't a, you know, we could debate whether stand your ground means you have to be in your own home or not, but he wasn't even in his own home. So if you're defending, you know, property, I suppose you might be able to defend someone else's property. But as the district court said, it was kind of an awkward factual match. What if the facts were that he went outside and told the intruder, leave or I'll call the police? Would he have a right to stand his ground at that point? Well, I mean, I don't know that the right to stand your ground would be based on South Dakota law. I think, I mean, there is this old Supreme Court case that's cited in the briefings that does talk about a stand your ground concept. So I guess that's what we might be here debating. I point that out because one of the other points that I frankly think is a fair one that the district court made is this wasn't an assimilated, you know, state law case. Of course, we see those in South Dakota quite a bit. This is a Major Crimes Act case, and so we're talking about federal law. And the district court said, you know, I'm concerned if we start adopting state jury instructions on federal charges that there's going to be a lack of uniformity around the country. I think that's a fair point, and I just wanted to point that out to this court because I thought it was a fair reason given by the district court. So, you know, there was a very robust record on the settling of this instruction and the reasons the district court gave. And, of course, this court reviews the district court's decision to give one instruction over another for an abuse of discretion. I just think this record doesn't support a finding that this district court abused its discretion. That's what struck me. I was going to ask counsel if he had argued this issue, but you've presumably done the same research. I don't know of a case where a district court was found to have abused its discretion by giving the Eighth Circuit model instruction, you know, on the nose, so to speak. Well, I agree. So you're not aware? I'm not. I'm not sure the issue has even come up much, but certainly not in the context. Well, you can't give the federal law instruction. You have to give the South Dakota, which I think you've answered. So then you're just down to is it an abuse of discretion to give the Eighth Circuit model instruction? Right. And not only that, Your Honor, but the case that was relied upon, the Greer case, you know, a fairly recent case that Your Honor authored. It's not on point. Well, it's relevant, but even in the same paragraph that it talks about the use of State instructions, it talks about the Milk case, and it even quotes the model instruction with approval that was given here. So even that Greer case stands for the proposal that this Court approves of the language of the model instruction. I've said all I came to say, Your Honors. If you have any more questions, I'd sure be happy to answer them. But if not, I'll take my seat. Thank you very much. Thank you. Let's make it two minutes of rebuttal. Judge Graz opened up something that you didn't get to. Yes. A lot to say in little time. As far as the jury instructions, Your Honor, our position is that not only does South Dakota law provide to instruct a jury that a defendant has a right to defend against a felony, the common law does. And that's what we cited the Beard case for. I didn't know. Who else? I'm sorry? You said not only South Dakota. Oh, the common law. Yes. And that's Beard. And the purpose of the jury instructions is to accurately instruct the jury in accordance with the law if the facts support it. And the model instructions are just that. They're model. Model instructions can and are sometimes modified to comply with the law. And so here, the model instructions should have been modified to instruct the jury that Mr. Thompson had the right to defend against a forcible felony. I accepted that. That was inherent in my question. Do you know of a case where a district court has been held in a major crimes act case or another federal criminal prosecution to have abused its discretion to give our model instruction? Yeah. I don't right off the top of my head, Your Honor. I don't think one was cited. It's pretty extraordinary. And I'm not saying I agree with you. They're not binding. Right. Yeah. So that's our point. And I think the real goal here is to make sure that Mr. Thompson received a fair trial. And it's just not a fair trial when he asked for a felony, a defense of felony instruction that was denied when it was fully supported by the law. I'm down to 10 seconds. So if there are no other questions, I would ask that Your Honor is either reverse or remand for new trial. Thank you. Thank you. The case has been well briefed and argued. And we'll take it under advisement.